# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
## No. 23-1626V

| | |
|---|---|
| AMANDA PAGE, | Chief Special Master Corcoran |
| Petitioner, | |
| v. | Filed: October 3, 2025 |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | |
| Respondent. | |

*Jimmy A. Zgheib, Zgheib Sayad, P.C., White Plains, NY, for Petitioner.*

*Madylan Yarc, U.S. Department of Justice, Washington, DC, for Respondent.*

### RULING ON ENTITLEMENT AND DECISION AWARDING DAMAGES[1]

On September 21, 2023, Amanda Page filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] ("Vaccine Act"). Petitioner alleged that she suffered a shoulder injury related to vaccine administration ("SIRVA") as a result of an influenza ("flu") vaccine received on November 28, 2022. Petition at 1. The case was assigned to the Special Processing Unit ("SPU") of the Office of Special Masters. The parties could not agree to entitlement or damages and their dispute was therefore submitted to resolution at an expedited proceeding on September 26, 2025.

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

For the following reasons, I find that Petitioner is entitled to compensation, and I award damages in the form of a lump sum payment of $124,125.29 ($120,000.00 for past pain and suffering, plus $4,125.29 for agreed-upon unreimbursed expenses).

## I.    Procedural History

The case was assigned to the SPU in November 2023. ECF No. 11. On September 9, 2024, Respondent filed a Rule 4(c) Report recommending that entitlement to compensation be denied. ECF No. 25 ("Rule 4(c) Report"). On March 7, 2025, Petitioner filed a motion for a ruling on the record as to both entitlement and damages. ECF No. 29 ("Pet'r Mot."). Respondent filed his response on April 16, 2025. ECF No. 30 ("Resp't Opp'n"). Petitioner filed a reply in support of her motion on April 25, 2025. ECF No. 31 (Pet'r Reply). On September 3, 2025, I set this matter for an expedited hearing.

At the end of the September 26, 2025 hearing, I issued an oral ruling from the bench on both entitlement and damages. That ruling is set forth fully in the transcript from the hearing, which is yet to be filed on the case's docket (but is fully incorporated into this Decision).

## I.    Factual Findings

Petitioner was 39 years old at the time of vaccination and worked as a teacher. Ex. 4 at 8. Petitioner was morbidly obese. *Id.* at 11. In the months prior to vaccination, she sought treatment, including an emergency room visit, for irritable bowel syndrome/diarrhea and abdominal pain. *See* Ex. 5 at 193, 253, 256, 283, 306; Ex. 12 at 557. Petitioner underwent various diagnosis tests and was diagnosed with type II diabetes, for which she was prescribed metformin. Ex. 5 at 193-196. Her blood tests also showed leukocytosis and chronically elevated liver enzymes. *See* Ex. 5 at 232; Ex. 12 at 417, 537, 543. An ultrasound revealed possible enlargement of the liver with some fat accumulation. Ex. 5 at 232, 252-253. Petitioner then established care with Duke Health Liver Clinic. *See* Ex. 12 at 611-617.

Petitioner received the flu vaccine in her left arm on November 28, 2022, at an appointment with her primary care provider ("PCP"), Dr. Christine Baker. Ex. 4 at 8. The purpose of this appointment was to follow up on Petitioner's diabetes, fatty liver issue, and gastrointestinal issues. *See id.* at 8-12. Dr. Baker recommended a GLP-1 agonist for weight loss and asked Petitioner to discuss this medication with her hepatologist, Dr. Maria Segovia. *See id.*

Later that same day, Petitioner messaged Dr. Segovia about obtaining a colonoscopy. Ex. 12 at 593. Dr. Segovia responded and suggested scheduling a video appointment to discuss a colonoscopy and recent liver labs. *Id.* The next day, November 29, 2022, Petitioner replied and reported "days of awful inflammation in [her] intestines and liver," as well as painful diarrhea. *Id.* at 592-593. She also conveyed that Dr. Baker wanted to take her off metformin and try "another medicine," presumably the GLP-1 agonist. *Id.* Further messages were exchanged about the scheduling of Petitioner's next appointment for December 5, 2022. *Id.* at 591-592.

On December 5, 2022, Petitioner messaged Dr. Baker about discussing "the new medication" with Dr. Segovia at her appointment later that day, and noted that she had a migraine the day before. Ex. 4 at 27. Dr. Baker responded that Petitioner should ask Dr. Segovia about a GLP-1 agonist. *Id.* at 26. Petitioner had a video appointment with Dr. Segovia that same day. Petitioner reported ongoing diarrhea and several months of dull, intermittent right upper quadrant pain that wrapped around her back. Ex. 12 at 611-617. Dr. Segovia suspected non-alcoholic steatohepatitis ("NASH"), but wanted to rule out auto-immune hepatitis. *See id.* Dr. Segovia scheduled Petitioner for a liver biopsy and also a colonoscopy. *Id.*

On December 7, 2022, Petitioner called and left a message with a medical assistant in Dr. Baker's office. Ex. 4 at 37. Petitioner stated that Dr. Segovia had advised her to stop taking metformin and wanted to clarify how to stop taking it. *Id.*

Petitioner underwent a liver biopsy on December 12, 2022. Ex. 12 at 661-663. The findings were consistent with NASH and there was no evidence of auto-immune hepatitis. *Id.* at 714.

On December 18, 2022, Petitioner sent another message to Dr. Baker. Ex. 4 at 26. This message was part of the earlier thread from December 5, 2022. *See id.* Petitioner reported that Dr. Segovia said that "the new medication" should be fine. *Id.* Petitioner then wrote, "I had a question about my flu shot. It has been 3 weeks and my arm still hurts. I can't lift my arm straight up without pain. Is this normal this round?" *Id.* Dr. Baker told Petitioner to call the office to schedule an appointment about her sore arm. *Id.*

Petitioner followed up and called Dr. Baker's office on December 22, 2022.[3] Ex. 4

---

[3] Petitioner may have had contact with Dr. Segovia's office on December 19 and 20, 2022. There are records with headers with these dates, and that list Petitioner's allergies, medical history *etc.*, but there are no further notes describing anything that occurred. *See, e.g.*, Ex. 12 at 702-710. It is possible that these records were generated because Dr. Baker sent Dr. Segovia a message about Petitioner's medications around these dates. *Id.* at 712-713.

at 45. A nurse wrote that Petitioner called with a complaint of "left arm pain where flu vaccination was given 3 weeks ago." *Id.* Petitioner described the pain with movement as 8/10 and at rest as 2/10. *Id.* The pain did not radiate. *Id.* Petitioner had tried heat, ice, and rest with minimal improvement. *Id.* Also on December 22, 2022, Petitioner spoke with Dr. Segovia to discuss the findings of the liver biopsy and managing NASH. Ex. 12 at 715.

Petitioner had an appointment with Dr. Baker on December 23, 2022. Ex. 4 at 49-56. Dr. Baker wrote that Petitioner presented with "[l]eft arm pain. Painful to raise the arm. X 3 weeks." *Id.* at 49, 52. Petitioner also reported that "following flu shot she has had some left tricep pain." *Id.* at 53. Dr. Baker suspected "mild muscle inflammation following injection or perhaps due to overuse or combination of both."[4] *Id.* at 55. Dr. Baker recommended stretches and taking naproxen as needed. *Id.*

In January and February 2023, Petitioner had appointments with the Duke Health Liver Clinic and Dr. Baker regarding her diabetes, weight loss medication, liver, and having almost passed out after donating blood. *See* Ex. 12 at 746; Ex. 4 at 69, 73, 94. It does not appear that Petitioner referenced her left shoulder pain at these appointments.

On February 27, 2023, Petitioner messaged Dr. Baker requesting a referral for an MRI on her shoulder/arm and to see a "shoulder specialist." Ex. 4 at 98. Dr. Baker provided a referral to orthopedist Dr. Darius Davina. *Id.*

Petitioner had an initial evaluation with Dr. Davina on March 2, 2023. Ex. 6 at 14. Dr. Davina's notes stated that Petitioner "did receive a flu injection to that area in December and has had pain to that area ever since." *Id.* Petitioner displayed positive impingement signs. *Id.* at 15. Dr. Davina took x-rays, which were normal. *Id.* Dr. Davina's plan was to rule out impingement syndrome versus deltoid inflammation. *Id.* He did not prescribe oral steroids because of Petitioner's diabetes, but prescribed naproxen. *Id.* Dr. Davina scheduled another appointment in two weeks to assess if she needed a steroid injection and MRI. *Id.* After this appointment with Dr. Davina, Petitioner saw Dr. Baker for a rash and ended up receiving oral steroids for poison ivy. Ex. 12 at 795; Ex. 4 at 109.

Petitioner returned to Dr. Davina on March 16, 2023. Ex. 6 at 12. Petitioner stated that the steroids for her poison ivy did not have any effect on her left shoulder pain. *Id.* Dr. Davina ordered an MRI. *Id.* The MRI revealed a "tiny intrasubstance tear of the mid subscapularis tendon" with no high-grade rotator cuff tear, "mild supraspinatus tendinosis," and "mild biceps tendinosis and tenosynovitis." *Id.* at 45. At the next appointment on April 27, 2023, Dr. Davina referred Petitioner to physical therapy ("PT")

---

[4] Respondent uses bold text for the words "or perhaps due to overuse" in the Rule 4(c) Report and opposition to Petitioner's motion, but does not make any argument on this point.

and recommended dry needling. *Id.* at 62-63.

On May 15, 2023, Petitioner had an initial appointment with Cora PT. Ex. 7 at 5. In her PT records, the onset date was recorded as "11/17/2022." *See id.* However, the section for her history and symptoms stated that Petitioner "was independent with all activities prior to Nov. 2022 when she started having left shoulder pain after a flu shot." *Id.* Petitioner had 17 total PT sessions through July 2023. *Id.* at 5-41. Petitioner was discharged from PT on July 28, 2023. *Id.* at 41.

Petitioner had appointments with Dr. Davina on June 8 and July 13, 2023. At the June appointment, Dr. Davina did not recommend a steroid injection because Petitioner denied any "deep shoulder pain" and only complained of pain in the "outer aspect of her left arm." Ex. 6 at 98. However, at the next appointment in July, Dr. Davina administered a subacromial steroid injection in her left shoulder. *Id.* at 135, 142.

On July 27, 2023, Petitioner had a telephonic appointment with Dr. Davina. Ex. 6 at 177.  Petitioner reported that the steroid injection only provided three days of pain relief. *Id.* Dr. Davina suggested that left shoulder arthroscopy could be an option and Petitioner expressed interest in having surgery. *Id.*

Petitioner saw Dr. Davina again on August 3, 2023. Ex. 6 at 173. Petitioner reiterated that the steroid injection had not been helpful and believed that PT was making her shoulder pain worse. *Id.* Dr. Davina and Petitioner decided to move forward with a left shoulder arthroscopy. *Id.* at 174.

Petitioner underwent surgery on August 30, 2023. Ex. 6 at 210. Dr. Davina performed a left shoulder partial labral debridement, partial chondroplasty of the humeral head and glenoid, and a subacromial decompression. *Id.*

At her first post-op appointment on September 14, 2023, Petitioner did not report any pain (although she was still taking opioid painkillers). Ex. 6 at 218. Petitioner had a further post-op appointment on October 12, 2023. Ex. 13 at 11. Petitioner stated that she was "doing much better at this point with an overall pain a 2/10." *Id.* Dr. Davina also believed that Petitioner had made "great improvement" and noted that her pain was "much more tolerable at this point." *Id.* However, Dr. Davina added that Petitioner still had issues with her overall range of motion. *Id.* Dr. Davina told Petitioner to continue with home exercises and naproxen as needed and that if she got "frustrated" in the future with shoulder pain, then she could return and they would discuss additional PT. *Id.*

Petitioner did not seek any further treatment for her left shoulder.

## II.    Ruling on Entitlement

### A.    Legal Standard

To receive compensation under the Vaccine Program, a petitioner must prove either (1) that he suffered an injury falling within the Vaccine Injury Table, or (2) that he suffered an injury that was actually caused by his vaccine. *See* Sections 13(a)(1)(A) and 11(c)(1). The petitioner carries the burden of establishing the matters required in the petition by a preponderance of the evidence. Section 13(a)(1)(A); *see Song v. Sec'y of Health & Hum. Servs.*, 31 Fed. Cl. 61, 65-66 (1994), *aff'd*, 41 F.3d 1520 (Fed. Cir. 2014).

The Vaccine Act prohibits finding that a petitioner has met this burden "based on the claims of a petitioner alone, unsubstantiated by medical records or by medical opinion." Section 13(a). Medical records must be considered, *see* Section 13(b)(1), and are generally afforded substantial weight. *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993). However, the Federal Circuit has "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021). The factual matters required to prove elements of a Vaccine Act claim may be established by a *mix* of witness statements and record proof, with the special master required to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe v. Sec'y of Health & Hum. Servs.*, 110 Fed. Cl. 184 (2013) (citing Section 12(d)(3); Vaccine R. 8), *aff'd*, 746 F.3d 1335 (Fed. Cir. 2014).

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Table, a SIRVA is compensable if it manifests within 48 hours of the administration of a flu vaccine. 42 C.F. R. § 100.3(a)(XIV)(B). The criteria establishing a SIRVA under the accompanying Qualifications and Aids to Interpretations ("QAI") are as follows:

Shoulder injury related to vaccine administration (SIRVA). SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction.

SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis (even if the condition causing the neurological abnormality is not known). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:

(i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;

(ii) Pain occurs within the specified time-frame;

(iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

(iv) No other condition or abnormality is present that would explain the patient's symptoms (*e.g.* NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id.*

## B.    Petitioner Has Proven Onset Within 48 Hours by a Preponderance of the Evidence

Respondent's only challenge to entitlement is onset, and he presents three arguments with respect to this issue. *See* Rule 4(c) Report at 8-10; Resp't Opp'n at 10-14. First, Respondent notes that Petitioner had several intervening appointments before December 18, 2022, in which she did not mention left shoulder pain. Second, when Petitioner did report left shoulder pain, she was not specific enough in recalling that it

started within 48 hours of vaccination. And third, Respondent points to records indicating that Petitioner's pain started either before or after the 48 hour window.

None of these arguments are persuasive. Respondent's first argument regarding intervening treatment in undermined by the fact that Petitioner reported left shoulder pain twenty days after vaccination, which is relatively quick for a SIRVA case and well within the timeframe that I have previously considered sufficient. Respondent mischaracterizes Petitioner's portal messages to Drs. Baker and Segovia about her ongoing diabetes and liver issues as separate encounters in which she would have had an opportunity to discuss all possible medical concerns.[5] *See* Resp't Opp'n at 13-14. And numerous cases have recognized that a petitioner's failure to mention shoulder pain at appointments for unrelated medical conditions does not necessarily undermine onset. Respondent's suggestion that Petitioner should have complained about left shoulder pain during a liver biopsy is particularly unconvincing.

Respondent's arguments also fault Petitioner for not conforming to the ideal of a perfect patient. For example, Respondent contends that Petitioner frequently reached out to her treaters, especially when she experienced new symptoms, and thus would have been expected to mention left shoulder pain more immediately out of concern that it could be connected to her underlying liver disease. *See id.* According to Respondent, a reasonable person "would have at least mentioned a new and significant symptom when seeking care for a changing clinical picture, even if it was quickly ruled out as unrelated by a medical doctor." *Id.* at 14. However, Petitioner already knew that her symptoms of diarrhea and abdominal pain were connected to her weight, diabetes, and fatty liver. As is normal in SIRVA cases, Petitioner explained that she believed her shoulder pain would dissipate and attempted to self-treat. This behavior does not weigh against finding a 48-hour onset.

With regard to Respondent's second argument, *see id.* at 11-12, Petitioner's statement on December 18, 2022, that "it has been 3 weeks and my arm still hurts" is not at all vague or ambiguous. Petitioner could have been more precise in her other reports of onset, but use of descriptive terms like "after,"  "following," or "ever since" the vaccination are generally understood in Vaccine Act SIRVA cases to mean shortly after the event. And Petitioner never pinpointed onset to a time *outside* of the 48 hours, as in the case cited by Respondent.

---

[5] Respondent also incorrectly counts the possible contacts with Dr. Segovia's office on December 19, 2022 and December 20, 2022 as intervening encounters when these in fact occurred after Petitioner had reported her left shoulder pain to Dr. Baker on December 18, 2022. *See* Resp't Opp'n at 11.

As to the third argument regarding inconsistent descriptions of onset, Respondent reads too much into stray errors in the medical records. Although a form box in Petitioner's PT records did state that onset began pre-vaccination on November 17, 2022, the actual text describing Petitioner's problem makes clear that her pain started after vaccination. *See* Ex. 7 at 5. Dr. Davina's notes stated that Petitioner "did receive a flu injection to that area in December and has had pain to that area ever since," Ex. 6 at 15, but this is most reasonably read as Petitioner misremembering the exact date of vaccination, which occurred at the very end of November.

The evidence thus supports a finding that Petitioner's shoulder pain began within 48 hours of vaccination. The remaining QAI and statutory requirements are not disputed, and I find that they are satisfied. Petitioner has established all statutory and Table requirements and is thus entitled to compensation.

## III.    Damages

In another recent decision, I discussed at length the legal standard to be considered in determining damages and prior SIRVA compensation within SPU. I fully adopt and hereby incorporate my prior discussion in Section II of *Matthews v. Sec'y of Health & Human Servs*., No. 22-1396V, 2025 WL 2606607 (Fed. Cl. Spec. Mstr. Aug. 13, 2025).

In sum, compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000.00." Section 15(a)(4). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Human Servs*., No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering.[6]

In this case, awareness of the injury is not disputed. The record reflects that at all times Petitioner was a competent adult with no impairments that would impact her awareness of his injury. Therefore, I analyze principally the severity and duration of Petitioner's injury.

---

[6] *I.D. v. Sec'y of Health & Human Servs*., No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) (quoting *McAllister v. Sec'y of Health & Human Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

When performing the analysis in this case, I review the record as a whole to include the medical records, declarations, affidavits, and all other filed evidence, plus the parties' briefs and other pleadings. I consider prior awards for pain and suffering in both SPU and non-SPU SIRVA cases and rely upon my experience adjudicating these cases. However, I base my determination on the circumstances of this case.

As explained at the September 26, 2025 hearing (and in many prior cases), awarding an amount for pain and suffering is an art and not a science. The parties should look to the general landscape of past pain and suffering awards, and specific past reasoned decisions that they believe to be directly "on point," when presenting their specific valuations of a case that is formally in damages. That information, when offered by the parties, can be highly useful in guiding my award (although a petitioner's personal circumstances are always the primary foundation of the award ultimately issued).

Petitioner seeks a pain and suffering award of $150,000.00. Pet'r Mot. at 12-14. In support of her proposed award, she cites *S.C.*, *Reed*, and *Reynolds*.[7] The *S.C.* and *Reed* petitioners were awarded $160,000.00 and the *Reynolds* petitioner was awarded $150,000.00. In the briefing, Respondent recommended an award of $80,000.00, relying on *Hunt* and *Shelton*, which awarded $95,000.00 and $97,500.00 respectively.[8] Resp't Opp'n at 24-25. During the Motions Day Hearing, Respondent made a new recommendation of $100,000.00.

I do not find that an award of $150,000.00 would be appropriate, however, because Petitioner's selected comparators all involved more severe courses of treatment. In *S.C.*, the petitioner sought treatment within a similar timeframe to the instant case and had one surgery, but had more severe findings on her MRI, higher subjective reports of pain, and received four steroid injections. Further, the *S.C.* petitioner also ultimately completed 95 sessions of PT (30 sessions pre-surgery and 65 sessions post-surgery). The total duration of treatment was also much longer and spanned several years.

Similarly, the *Reed* petitioner sought treatment in a short timeframe and had one steroid injection and one surgery, but had a more intense course of treatment involving two orthopedists over a much longer time period. That petitioner reported immediate high levels of pain and difficulty with range of motion. She also did not have much improvement

---

[7] *S.C. v. Sec'y of Health & Hum. Servs.*, No. 19-341V, 2021 WL 2949763 (Fed. Cl. Spec. Mstr. June 14, 2021), *Reed v. Sec'y of Health & Hum. Servs.*, No. 16-1670V, 2019 WL 1222925 (Fed. Cl. Spec. Mstr. Feb. 1, 2019), and *Reynolds v. Sec'y of Health & Hum. Servs.*, No. 20-294V, 2022 WL 17819545 (Fed. Cl. Spec. Mstr. Nov 7, 2022).

[8] *Hunt v. Health & Hum. Servs.*, No. 19-1003V, 2022 WL 2826662 (Fed. Cl. Spec. Mstr. June 16, 2022) and *Shelton v. Sec'y of Health & Hum. Servs.*, No. 19-279V, 2021 WL 2550093 (Fed. Cl. Spec. Mstr. May 21, 2021).

after surgery and was prescribed long-term opioid pain medication through a pain management doctor.

In *Reynolds*, the main similarities to the instant case are again the short timeframe for seeking treatment and that the petitioner underwent one surgery. But the *Reynolds* petitioner received a total of four steroid injections and participated in 49 sessions of PT (24 pre-op and 25 post-op). Further, she received treatment for three years post-vaccination.

However, Respondent's cases are also not all that on point. As Petitioner correctly notes, *Hunt* and *Shelton* are outliers from the general six-figure benchmark for pain and suffering awards in SIRVA cases involving surgery. Pet'r Reply at 11 (citing *Hathcock v. Sec'y of Health & Hum. Servs.*, No. 20-0005V, 2025 WL 512186, at *12 (Fed. Cl. Spec. Mstr. Jan. 14, 2025)). Further, the *Hunt* petitioner had periods without any pain and the *Shelton* petitioner had a long initial treatment gap. This case does not involve any similar issue that would counsel against a higher award for pain and suffering. Respondent's proposed award of only $80,000.00 would fall well outside the norm for a SIRVA case of this caliber.

Thus, having reviewed the record and briefing, I find that none of the parties' cases are particularly analogous. The appropriate award for Petitioner should be somewhere between the parties' preferred figures. I look to the recent Motions Day decision in *McDonald*, which awarded $115,000.00 for pain and suffering, as a useful comparator for a moderate SIRVA involving one surgery.[9]

The *McDonald*, petitioner (a 38 year-old nurse) reported pain within two weeks post-vaccination to her PCP, and then went to an orthopedist. She received one steroid injection and participated in eight PT sessions. The petitioner returned to the orthopedist two months later with an exacerbation of symptoms. She received another steroid injection. She then underwent arthroscopic surgery about seven months after vaccination. At her final post-op orthopedic appointment, the doctor noted improvement, but still some deficits. The petitioner completed 12 more PT sessions and had her final session approximately 10 months after vaccination. She still had some limitations in range of motion but apparently did not seek further treatment.

Overall, given the slightly longer course of treatment here as compared to *McDonald*, I find it appropriate to award $120,000.00 for pain and suffering (along with

---

[9] *McDonald v. Sec'y of Health & Hum. Servs.*, No. 22-0215V, 2025 WL 778359 (Fed. Cl. Spec. Mstr. Feb. 5, 2025)).

the undisputed amount of unreimbursed medical expenses).[10]

## Conclusion

For the foregoing reasons and based on consideration of the entire record, **Petitioner is awarded a lump sum payment of $124,125.29 ($120,000.00 for past pain and suffering, and $4,125.29 for unreimbursed expenses) to be paid through an ACH deposit to Petitioner's counsel's IOLTA account for prompt disbursement.** This amount represents compensation for all damages that would be available under 42 U.S.C. § 300aa-15(a).

The Clerk of the Court is directed to enter judgment in accordance with this Decision.[11]

**IT IS SO ORDERED.**

<u>**s/Brian H. Corcoran**</u>
Brian H. Corcoran
Chief Special Master

---

[10] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Hum. Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Hum. Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

[11] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.